IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DAVID WORKMAN,

    Plaintiff,

v.

NORTH AMERICAN LIGHTING, INC.,

    Defendant.

No. 21-cv-1230-JPG

**MEMORANDUM AND ORDER**

This matter comes before the Court on the motion for summary judgment filed by defendant North American Lighting, Inc. ("NAL") (Doc. 27). Plaintiff David Workman has responded to the motion (Docs. 28/32), and NAL has replied to that response (Doc. 31). The Court held oral argument on the motion on February 15, 2023.

**I.  Background**

This case arose after Workman, a former NAL employee, asserted his right to intermittent leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* NAL terminated Workman in November 2020 after he had accumulated too many points under its point-based attendance policy. Workman believes NAL interfered with his right to use FMLA leave by improperly counting three days of FMLA absences to place him in violation of the attendance policy. NAL maintains that some of the leave Workman took was not eligible leave under the FMLA and, as for leave that was covered by the FMLA, he did not give sufficient notice to NAL of his intent to take the FMLA leave.

**II.  Summary Judgment Standard**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022).  The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Weaver*, 28 F.4th at 820.  Nevertheless, the "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture."  *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotations and citations omitted).

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial.  *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  Where the nonmoving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways.  It may present evidence that affirmatively negates an essential element of the nonmoving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the nonmoving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B).  *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169.  Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion.  *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists.  *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168.  A genuine issue of material fact is not demonstrated by the

mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

**III.   Facts**

    A.   Workman's Declaration

In settling on these facts for the purpose of this motion, the Court has considered Workman's declaration attached to his response. NAL urges the Court to disregard that declaration because it believes the declaration is an attempt to change answers Workman gave in his deposition, many of which expressed uncertainty or a lack of memory of specific facts. Workman claims that the deposition questions were confusing, that the days about which he was asked were "complicated" days, and that his current declaration does not contradict his deposition testimony but only clarifies his answers after further time to remember details.

The law is well-established that "in general, parties may not 'patch-up potentially damaging deposition testimony' with a contradictory affidavit." *Commercial Underwriters Ins. Co. v. Aires Envt'l Servs., Ltd.*, 259 F.3d 792, 799 (7th Cir. 2001) (citing *Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999)). The Court will generally ignore a later contradictory affidavit unless the deponent offers a suitable explanation—such as confusion, mistake, memory lapse—for the discrepancy. *Stinnett v. Iron Works Gym/Exec. Health Spa, Inc.*, 301 F.3d 610, 614 (7th Cir. 2002); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995). This rule applies, however, only where the discrepancies are transparent shams in an effort to change

testimony, not where they are simply clarifications or augmentations of earlier ambiguous or confusing statements where they merely go to the credibility of the witness. *Howell v. Smith*, 853 F.3d 892, 900 n.18 (7th Cir. 2017); *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1169-72 (7th Cir. 1996).

In his declaration and at the oral argument, Workman offered a suitable explanation for any discrepancies between his deposition responses and his later declaration. Workman was confused by the wording of the questions during the deposition and had trouble remembering details about hectic days. He has now had further time to reflect and remember details that were not specifically solicited during his deposition. The Court finds this an acceptable explanation for any discrepancies, which will go to Workman's credibility at trial but which do not call for disregarding his declaration in its entirety. The impact of the shifting answers is for the jury to consider when weighing Workman's credibility.

B.   Relevant Facts

Viewed in the light most favorable to Workman, the evidence establishes the following relevant facts.

Workman began working for NAL in its Flora, Illinois, facility in April 2015. NAL had an attendance policy under which employees could be terminated for accumulating excessive points for absences. Under that system, NAL would assess one point for every unexcused absence of more than half of a shift, and a half-point for every unexcused absence of a half-shift or less. Points would be removed twelve months after they were incurred. Approved leave, including under the FMLA, was not counted as an unexcused absence so did not earn an employee any points. An employee was terminated if he accumulated seven points.

4

NAL's policies regarding leave required employees who were going to be absent from work to notify their supervisor as early as possible but no later than an hour before the employee's scheduled shift started.   However, since Workman's intermittent need for FMLA need was not always foreseeable, he was instructed to notify whichever supervisor was on duty an hour before his shift or, if no one answered the phone, to leave a voice mail message.

In March 2020, Workman sought intermittent leave under the FMLA to care for his wife because of her postural orthostatic tachycardia syndrome ("POTS"), a heart condition.[1]   NAL approved his use of intermittent leave generally, and approved many of Workman's specific intermittent FMLA leave requests.   Workman felt harassed for using his FMLA leave because some of his supervisors had commented sarcastically that it was nice of him to actually show up to work.   He reported this to Jonita Mitchel, NAL's human resources manager for the Flora facility, but the comments continued.   At least one supervisor expressed frustration that Workman used FMLA leave so often, but another supervisor expressed a recognition that nothing could be done about it because it was FMLA leave.

By the beginning of August 2020, NAL had assessed Workman four points under the attendance policy.   At issue in this case are points NAL assessed for August 9, 13, and 14, 2020. Workman also cites points assessed for October 29, 30 and 31, 2020:

- On August 9, Workman called in before his shift and left a message saying he would need to use FMLA leave that day because he needed to care for his wife, who had been bitten by a spider and whose preexisting medical condition caused concerns about the bite.   At home, she was experiencing low blood pressure and high heart rate, symptoms of POTS, although at the doctor's office the following

---

[1] POTS is "is a condition that causes your heart to beat faster than normal when you transition from sitting or lying down to standing up."   Cleveland Clinic, https://my.clevelandclinic.org/ health/diseases/16560-postural-orthostatic-tachycardia-syndrome-pots.

    day she did not display these symptoms.   NAL assessed Workman a half-point.
    There is a genuine issue of fact whether Workman's wife's need for care qualified
    Workman to take FMLA leave for her POTS when she experienced the additional
    trauma of a spider bite.   A chronic condition like POTS can complicate or be
    exacerbated by other medical problems like a spider bite, so Workman's leave
    could have fallen within the category of his pre-approved intermittent leave.

- On August 13, Workman left work early because his wife was having issues related to her medical condition, and he told his supervisor this before leaving. His supervisor reports that Workman said he was leaving because he himself did not feel well.   NAL assessed him a point.   The reason Workman gave for leaving this day presents a genuine issue of fact.

- On August 14, Workman called in before his shift and told a supervisor he needed to take FMLA leave that day because his wife's health issues from the previous day were continuing.   NAL assessed him a point.   Whether Workman was absent to care for his wife or for himself presents a genuine issue of fact.

- On October 29, Workman left work at his regular time; he had not been drafted to work late that day.   Nor was there any draft that day for shifts on October 31. NAL assessed him a half-point.

- On October 30, Workman called in before his shift and told a supervisor his wife was having issues related to her medical condition and he needed to care for her that day.   He does not remember exactly what he told NAL, but NAL assessed him a point.   The reason Workman gave for leaving this day presents a genuine issue of fact.

- On October 31, Workman did not call in or report to work because he had not been assigned to work that day.   NAL assessed him a point.

    On November 2, 2020, NAL discharged Workman on the grounds that, in light of the fact that the foregoing six absences counted as "unexcused," he had accumulated 8.5 points under the attendance policy.   Mitchel made the final discharge decision, but that decision was based on supervisors' reports to her about whether Workman's leave qualified as FMLA leave and

6

whether Workman had specifically requested FMLA leave.

Workman claims he was wrongfully discharged because the six absences listed above qualified for intermittent leave under the FMLA and NAL should not have considered them unexcused or assessed attendance points for any of them.   NAL disagrees, and further notes that, had it counted those absences as FMLA leave, Workman would have exhausted his 480 hours of FMLA leave before he was terminated.

**IV.   Analysis**

In general, the FMLA provides leave for qualified employees who must be absent from work for family or medical reasons.   29 U.S.C. § 2601 *et seq.*; *Price v. City of Fort Wayne*, 117 F.3d 1022, 1023 (7th Cir. 1997).   Specifically, the FMLA seeks to provide up to twelve weeks (480 hours) of leave within a twelve-month period for an eligible employee who suffers, or who has a family member who suffers, from a serious health condition.   The FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."   29 U.S.C. § 2611(11); *see Price*, 117 F.3d at 1024.

The FMLA specifically allows the covered employee to take such leave intermittently or on a reduced leave schedule when medically necessary, even though the employer may not agree to such arrangement.   29 U.S.C. § 2612(b)(1).   "Intermittent leave" encompasses leave taken in separate blocks of time because of a single illness or injury, rather than leave taken for one continuous period of time.   It also may include leave in periods from an hour or more to several weeks.   29 C.F.R. § 825.205(a).

Under the FMLA, it is unlawful for an employer, "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). In order to prevail on an FMLA interference claim, "the employee must establish that: (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006); *accord Hickey v. Protective Life Corp.*, 988 F.3d 380, 387 (7th Cir. 2021).

The parties agree that Workman was eligible for FMLA leave and that NAL was covered by the FMLA. They disagree, however, whether some of the leave he took qualified as the kind of intermittent leave for which he was approved, whether he gave sufficient notice of his intent to take that leave, and whether NAL denied him FMLA leave to which he was entitled.

Looking at the evidence construed in Workman's favor, a reasonable jury could conclude that NAL interfered with Workman's use of FMLA leave. A jury could conclude that other non-POTS health problems, like a spider bite, might have posed a special danger to Workman's wife because of her POTS, and that Workman's leave was, in fact, to care for his wife under the terms for which NAL had approved intermittent leave. Indeed, Workman's leave was supported by doctor's notes, albeit not specific enough for NAL's liking. A jury could also find that before his absences on August 9, 13, and 14, and October 30 Workman gave the type of notice that NAL required in Workman's circumstances, where his need for intermittent leave could not be predicted. And finally, a jury could conclude that Workman was entitled to FMLA leave for his absences, at a minimum, on August 9, 13, and 14, and October 30. The evidence on these

8

points essentially presents a credibility contest between Workman and NAL personnel that is proper for a jury to decide.   While it is true that Workman's testimony as reflected in his declaration—the primary evidence on which his case rests—might be subject to strong impeachment by his prior deposition testimony, he is entitled to present it to a jury.

As for Workman's absences on October 29 and 31, there is no evidence from which a reasonable jury could conclude that those absences were in any way related to Workman's use of FMLA leave or that they interfered with his use of FMLA leave.   He does not assert that he needed to use FMLA leave those days.   Instead, he admits that he did not come to work those days because he did not know he had been drafted to work then, not because he needed to care for his wife.   The Court does not believe a reasonable jury could conclude that Workman was assessed attendance points for failing to report to work on those days because of some nebulous hostility toward his use of FMLA leave.   While NAL employees may have been frustrated that he used FMLA so often, they also displayed a respect, reinforced by guidance from Human Resources, for the fact that they must tolerate Workman's taking leave under the FMLA.   And in any case, Workman did not complain in his complaint that these absences were improperly characterized as non-FMLA leave.

Furthermore, a jury should decide what, if any, damages might be awardable.   It appears to the Court that, between Workman's unexcused leave and his limited FMLA leave, he could have been fired under the leave policy regardless of whether the 4 days of leave were credited to FMLA leave.   Indeed, its "Time Detail" records of Workman's leave show that between October 28, 2019, and October 23, 2020, NAL had allowed Workman to take 482 hours of

FMLA leave (Doc. 27-14).² Had NAL recorded Workman's August 9, 13, and 14 absences as FMLA leave, it appears he would have run out on October 1, 2020, and possibly again on October 30, 2020.³ It follows that leave taken after those points would have been unexcused and would have rendered Workman in violation of the leave policy. Whether there is any back pay or front pay to be awarded at all is a question for the jury.

## V. Conclusion

For the foregoing reasons, the Court **DENIES** NAL's motion for summary judgment (Doc. 27). However, in light of impeachable testimony from Workman and the possibility of a minimal damages award, the Court encourages the parties to consider additional mediation before they incur the expense of trial preparation and trial.

**IT IS SO ORDERED.**
Dated:   February 22, 2023

> s/ J. Phil Gilbert
> **J. PHIL GILBERT**
> **DISTRICT JUDGE**

---

² Workman also complains that NAL forced him to take FMLA leave when he showed up for work with symptoms of COVID and was not allowed to work. That FMLA leave substantially contributed to the exhaustion of his allotted 480 hours. The propriety of counting such leave as FMLA leave is beyond the scope of Workman's complaint, which cites solely the failure to record August 9, 13, and 14, 2020, as FMLA leave.

³ By that time, the eight hours of FMLA leave taken on October 28, 2019, would no longer be counted in the running twelve-month total. If Workman's leave on October 28 and 29, 2020, were counted as FMLA leave, that would still have exhausted his FMLA leave as of October 30, 2020.